UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

ROSALYN ALEXANDER,

Plaintiff,

-against-

WINTHROP, STIMSON, PUTNAM and ROBERTS
LONG TERM DISABILITY COVERAGE, et al.,

Defendants.

-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

04 CV 760 (RJD) (KAM)

Gary Steven Stone
Attorney for Plaintiff
Legal Services for the Elderly
130 West 42nd Street, 17th Floor
New York, NY 10036

Edward Joseph Boyle
Attorney for Defendants
Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P.
150 East 42nd Street, 23rd Floor
New York, NY 10017

DEARIE, Chief Judge.

Plaintiff, formerly an employee of defendant law firm Winthrop, Stimson, Putnam and

Roberts LLP ("Winthrop Stimson"), brings this action pursuant to the Employee Retirement

Security Income Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., and claims that defendants

Winthrop Stimson and Prudential Insurance Company of America ("Prudential") improperly

denied her long-term disability benefits. Plaintiff moved for summary judgment, and defendants

cross-moved for judgment on the administrative record. In a Memorandum & Order dated

September 27, 2005, the Court denied both motions and invited the parties to submit final

submissions addressing the facts. Both parties having done so, and upon a de novo review of the

administrative record, the Court finds that plaintiff is totally disabled within the meaning of

Winthrop Stimson's long-term disability benefits plan and therefore is entitled to benefits.

## BACKGROUND

The facts underlying this case are set out in detail in this Court's Memorandum and Order

of September 27, 2005. Accordingly, the Court now provides only a brief summary.

Plaintiff, now sixty years old, was employed continuously for thirty-three years, and

worked at Winthrop Stimson as a legal secretary for at least nine years.[1]  Pl.'s Rule 56.1 Stat't ¶¶

1-2. Beginning in 1994, plaintiff began experiencing lower back pain, which she claims made it

increasingly difficult for her to perform her secretarial duties. Id. ¶¶ 3, 6. She was placed on

disability leave from Winthrop Stimson on several occasions. Id. ¶ 6; PRU198.[2]  By November

1997, according to plaintiff, she was unable to return to work. Pl.'s Rule 56.1 Stat ¶ 6.

On February 9, 1998, plaintiff applied for benefits under Winthrop Stimson's Long Term

Disability Coverage plan (the "Plan"), which is underwritten by defendant Prudential. Defs.'

Rule 56.1 Stat't ¶¶ 3, 6. On March 12, 1998, Winthrop Stimson notified plaintiff by letter that

"based upon [her] doctor's determination that [she was] totally disabled . . . it [was] not possible

to continue to hold a position open for [her]," and that it had terminated her employment

retroactive to February 26, 1998. Pl.'s Rule 56.1 Stat't ¶ 12; PRU127. On May 19, 1998,

Prudential approved the payment of benefits. Id. ¶ 15. Several months later, on January 28,

---

[1]Plaintiff claims to have worked at Winthrop Stimson from 1984 to 1997, Pl.'s Rule 56.1 Stat't ¶ 2. Defendants claim that she began working there in 1988, Defs.' Rule 56.1 Stat't ¶ 1.

[2]The parties have stipulated that documents PRU001 through PRU402 (leading zeroes omitted) constitute the administrative record in this case.

1999, Prudential reversed this decision. Id. ¶ 21. Plaintiff appealed, but her appeal was unsuccessful. Prudential's final denial of benefits issued on July 27, 1999. Id. ¶ 36.

While pursuing benefits under the Plan, plaintiff also applied for Social Security Disability insurance benefits. The attorneys who represented during this process were recommended to her and paid by Prudential. PRU278. Her application was denied, PRU275, but an Administrative Law Judge ("ALJ") reviewed the denial, and on July 13, 1999, without requiring a hearing, he issued a ruling in which he found that plaintiff was disabled and entitled to receive benefits. Pl.'s Rule 56.1 Stat't ¶¶ 33-35; PRU151-61.

Plaintiff subsequently brought this ERISA action.

## DISCUSSION

### A.    Standard of Review and Procedural Posture

Plaintiff challenges defendants' denial of long-term disability benefits under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), which empowers a participant in an employee benefit plan within the statute's coverage to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan"; and under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), which empowers a plan participant to bring a civil action "to enjoin any act or practice which violates any provision of this title or the terms of the plan, or . . . to obtain other appropriate equitable relief . . . to redress such violations or . . . to enforce any provisions of this title or the terms of the plan." See Am. Compl. ¶¶ 42, 50.

As the Court explained in its Memorandum & Order of September 27, 2005, Prudential

did not have discretionary authority to determine plaintiff's eligibility for long-term disability benefits under the Plan. Thus the Court reviews Prudential's denial of benefits de novo. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989) ("[W]e hold that a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.").

Plaintiff's motion for summary judgment having been denied, the Court proceeds based on an examination of the administrative record. See Muller v. First Unum Life Ins. Co., 341 F.3d 119, 124 (2d Cir. 2003) ("[T]he decision on the motion for judgment on the administrative record, or the District Court's de novo review of the parties' submissions and resolution thereof, can best be understood as essentially a bench trial on the papers with the District Court acting as the finder of fact. Since there is no right to a jury trial under ERISA, this form of bench trial was entirely proper.") (internal quotation marks and citation omitted).

Plaintiff bears the burden of proving her entitlement to benefits. See Slupinski v. First Unum Life Ins. Co., No. 99 Civ. 0616, 2005 U.S. Dist. LEXIS 21601, at *18 (S.D.N.Y. Sept. 27, 2005) ("It is well established that plaintiff bears the burden of showing that he was entitled to long term disability benefits under his plan.") (citing Maniatty v. UNUMprovident Corp., 62 Fed. Appx. 413 (2d Cir. 2003)); O'Sullivan v. Prudential Ins. Co. of Am., No. 00 Civ. 7915, 2002 U.S. Dist. LEXIS 5349, at *22 (S.D.N.Y. Mar. 29, 2002) ("The burden of establishing total disability . . . rests with [plaintiff].") (citing Barnable v. First Fortis Life Ins. Co., 44 F. Supp. 2d 196, 204 (E.D.N.Y. 1999)).

**B.      Plaintiff's Entitlement to Long-Term Disability Benefits**

Under the terms of the Plan, plaintiff is "totally disabled" and entitled to benefits if she

meets the following conditions:

(1)     Due to Sickness or accidental Injury, both of these are true:
        (a)     [She is] not able to perform, for wage or profit, the material and
                substantial duties of [her] occupation.
        (b)     After the Initial Duration of a period of Total Disability, [she is]
                not able to perform for wage or profit the material and substantial
                duties of any job for which [she is] reasonably fitted by [her]
                education, training or experience. . . .
(2)     [She is] not working at any job for wage or profit.
(3)     [She is] under the regular care of a Doctor.

PRU373.  Neither party disputes that plaintiff is not working for wage or profit, or that she is

under a doctor's regular care.  Thus two questions are in dispute:  (1) whether plaintiff can

perform the material and substantial duties of her occupation; and (2) whether plaintiff can

perform the material and substantial duties of any other occupation for which she is reasonably

fitted by her education, training, and experience.  Upon <u>de novo</u> review of the administrative

record, the Court answers both questions in the negative.  It finds that plaintiff suffers from

severe, chronic lower back pain; that, as a result, she can perform neither the material and

substantial duties of her own occupation, nor those of any other occupation for which she is

reasonably fitted; that she is totally disabled within the meaning of the Plan; and that she is

entitled to receive benefits.


**1.      Plaintiff Suffers From Severe, Chronic Lower Back Pain**

Plaintiff's complaints of pain are an important factor to be considered in determining

whether she is disabled.  <u>Connors v. Connecticut Gen. Life Ins. Co.</u>, 272 F.3d 127, 136 (2d Cir.

5

2001) ("It has long been the law of this Circuit that 'the subjective element of pain is an important factor to be considered in determining disability.'") (quoting Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984)).

Citing diagnoses of degenerative arthritis, facet degenerative disease, lumbosacral myofasciitis, and fibromyalgia,[3] Pl.'s Final Submission J. Pleadings [hereinafter Pl.'s Mem.] at 2 n.2, plaintiff claims to have suffered from severe, persistent lower back pain since 1994. Defendants respond that the medical evidence in the record does not substantiate plaintiff's complaints. In particular, they point to the finding of consulting physician Dr. Barry Halejian that plaintiff's account of her symptoms "was out of proportion to the objective medical findings." Defs.' Reply Final Submission [hereinafter Defs.' Reply] at 4.

The Court finds that the record contains substantial medical evidence supporting plaintiff's claims of severe, persistent lower back pain. The evidence includes magnetic resonance imaging ("MRI") scans of plaintiff's back from 1994 and 1998 indicating a disc bulge at L5-S1, degenerative arthritis, and facet degenerative disease, PRU305, PRU211; as well as a 1997 X-ray revealing degenerative changes in plaintiff's lumbar spine, PRU262.

Also supporting plaintiff's account is the opinion of Dr. Santi DiFranco, who has treated

---

[3]Defendants suggest that plaintiff's claim to suffer from several different conditions weakens her position. They cite Brandi v. Good Lad Co. Long Term Disability Plan, in which a district court of this circuit granted summary judgment in favor of a plan administrator where an ERISA plaintiff's original claim mentioned only that he suffered from ulcers, but his later submissions described back problems. No. 97 Civ. 4511, 1998 U.S. Dist. LEXIS 12740, at *19-20 (S.D.N.Y. Aug. 18, 1998). They argue that "Plaintiff's actions are consistent with the plaintiff in Brandi . . . and as such, should be treated similarly." Defs.' Reply Mem. Supp. Cross-Mot. J. Admin. R. at 9. The Court disagrees. Unlike the plaintiff in Brandi, who complained of two apparently independent medical problems—ulcers and lumbar radiculopathy—plaintiff describes a constellation of interrelated conditions: disorders of the lumbar spine.

plaintiff for her back problems since 1995, and who reported in 1998 that plaintiff suffered from a "painful bulge of the lumbar discs in her spine"; that she was participating in physical therapy, taking amitriptyline and hydrocodone to relieve her pain, and wearing a back brace; and that she was unable to work. PRU304, 400. Defendants argue that Dr. DiFranco's January 17, 1998 report "lacks the necessary foundation for this Court to determine that Prudential's determination was incorrect or that Plaintiff is disabled." Defs.' Reply at 2. But the record indicates that Dr. DiFranco was in possession of clinical evidence capable of supporting his findings, including the 1994 MRI and 1997 X-rays, which were carried out in accordance with referrals by Dr. DiFranco and whose results were reported to him. PRU261-62, 268.

Likewise, the report of orthopedist Dr. Sounder Eswar, who examined plaintiff in March 1998, reflects a positive straight leg raising test (a finding associated with back problems),[4] as well as Dr. Eswar's impression that plaintiff suffered from a herniated disc, and his recommendation that she continue taking pain medication (Dr. Eswar did not specify which medication) and consider surgery "if there is further deterioration of her symptoms." PRU248-49. These elements of Dr. Eswar's report belie defendants' insistence that Dr. Eswar "failed to diagnose a condition more serious than tingling, prickling or numbness in the Plaintiff's right leg (paresthesiasis) and a weak right big toe muscle," Defs.' Final Submission [hereinafter Defs.' Mem.] at 7.

Further support for plaintiff's claim is provided by the opinion of neurologist Dr. Mehrdad Golzad, who began treating plaintiff in 1997, saw her at least four times over a period

---

[4]Although Dr. Eswar reported that plaintiff's straight leg raising test was "position," the Court assumes that this was a typographical error.

of fifteen months, directed on each occasion that plaintiff should take amitriptyline (under the brand name "Elavil") for her pain, and diagnosed her as suffering from fibromyalgia and myofasciitis. PRU182, 208, 252, 402. The evidence submitted by Dr. Golzad does not weigh as heavily in plaintiff's favor as that offered by Dr. DiFranco, since, as defendants point out, Defs.' Mem. at 7-8, Dr. Golzad found in a December 12, 1997 examination that certain indicators of a back problem were absent, e.g., plaintiff's straight leg raising test was negative and her range of motion was normal, PRU253. In addition, Dr. Golzad's reports indicate that although plaintiff's physical condition did not improve under his care, the Elavil did alleviate her symptoms. PRU208. In fact, a December 4, 1998 report by Dr. Golzad indicates that when plaintiff took her medication, she was "symptom free." PRU402. Plaintiff claims, however, that the medication reduces, but does not eliminate, her pain, PRU181, and that it produces debilitating side effects, including drowsiness and dizziness. PRU163, 181, 198. See Woods v. McBride, 430 F.3d 813, 818 (7th Cir. 2005) (describing Elavil as "an antidepressant, psychotropic drug that causes drowsiness as a side effect"); Paxhia v. Shmigel, No. 85-CV-1299E, 1992 U.S. Dist. LEXIS 12361, at *2 (W.D.N.Y. July 27, 1992) (describing Elavil as "an anti-depressant medication with sedative side effects"); Carrasquillo v. LeFevre, No. 80 Civ. 996, 1982 U.S. Dist. LEXIS 12779, at *5 (S.D.N.Y. May 13, 1982) (describing Elavil as "an anti-depressive drug [which] may have side effects on certain patients, such as sleepiness, or over-excitement."). Moreover, in his report of March 29, 1999 (the latest of his reports that appears in the record), Dr. Golzad affirmed his diagnosis of lumbosacral myofasciitis and opined that plaintiff's symptoms "have considerably limited [her] activities of daily living." PRU182.

Though not binding on this Court, the findings of the Social Security Administration

("SSA") ALJ who granted plaintiff's application for Social Security benefits also constitute

evidence substantiating plaintiff's claim to suffer from severe, chronic lower back pain. See

Paese v. Hartford Life & Accident Ins. Co., 449 F.3d 435, 442 (2d Cir. 2006) ("The court acted

well within its discretion when it considered the SSA's findings as some evidence of total

disability, even though they were not binding on the ERISA Plan, and even though the SSA's

definition of disability may differ from that in the [Plan]."). The ALJ's ruling not only reflects

his own judgment that plaintiff was disabled, but also notes the findings of two consulting

physicians who examined plaintiff in connection with her application for benefits. Dr. Kyung

Seo, an orthopedist, found that plaintiff's range of motion of the lumbosacral spine was limited,

and that plaintiff was experiencing spasm in the paraspinal muscles of the lower back. PRU156.

His diagnosis, as memorialized by the ALJ, was "low back pain, probably due to bulging disc or

small herniating disc and facet arthritis." Id. Meanwhile, Dr. Arnold J. Slovis, a state agency

medical consultant who prepared an assessment of plaintiff's residual functional capacity,

diagnosed plaintiff with a lumbosacral spine disorder.[5] Id. Based on these opinions, as well as

on those of Drs. DiFranco, Eswar, and Golzad, the ALJ concluded that although plaintiff did not

suffer from any of the impairments specifically enumerated in the applicable regulations, "[t]he

medical evidence establishe[d] that [she had] severe low back pain radiating down the right leg . .

---

[5]Defendants contend that the Court may not consider the opinion of Dr. Slovis, arguing
that it is outside the administrative record. See Defs.' Resp. to Pl.'s Rule 56.1 Stat't ¶¶ 31-32
(objecting to plaintiff's statements based on the opinion of Dr. Slovis "on the basis that the
administrative record does not contain any records from Dr. Arnold Slovis."). Indeed, a
presumption exists that a court reviewing the decision of an ERISA plan administrator will not
look beyond the administrative record, though it may do so where good cause exists. Muller, 341
F.3d at 125. In this case, however, it is not necessary to enlarge the record, because the Court
relies on the ALJ's characterizations of the findings of Drs. Seo and Slovis, which the record
contains. Thus defendants' objection fails.

. ." PRU157. He found as well that her "subjective complaints of pain [were] credible in that they [were] supported by the medical evidence." Id.

Defendants question the value of the ALJ's assessment on the ground that "[n]o consideration was ever made for any report of Dr. Halejian." Defs.' Mem. at 9. The Court disagrees, however, that this omission "undermines the utility of the SSA decision," id. at 10, since the ALJ did have the benefit of reports by five other physicians, two of whom treated plaintiff over lengthy periods of time, and all of whose judgments were substantially consistent with each other and supported by objective medical evidence, including MRIs and X-rays. Under these circumstances, even if Dr. Halejian's report had been available, the ALJ would properly have privileged the opinions of plaintiff's treating physicians over the partially contrary opinion of Dr. Halejian, who examined her once. See 20 C.F.R. § 404.1527(d)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). Moreover, the ALJ's discussion of the opinions of Drs. Seo and Slovis has value independent of his own conclusions, as it offers an additional window into how plaintiff's condition appeared to examining physicians.

As noted above, defendants also attempt to cast doubt on plaintiff's account of her symptoms by reference to the report of Dr. Halejian, who examined plaintiff once at Prudential's request[6] and concluded that her complaints of pain were "out of proportion with the objective

---

[6]Defendants insist that "it was not Prudential that hired and chose Dr. Halejian," Defs.' Reply at 5, but it is undisputed that Dr. Halejian examined plaintiff at Prudential's request, see PRU010 (Prudential file note of December 10, 1998 stating that "it would be beneficial to send

findings." PRU230. In particular, defendants call attention to certain of Dr. Halejian's conclusions: that the numbness plaintiff reported experiencing in her right leg was "non-anatomical"; that she did not complain of pain on distraction and palpation; and that "in the seated position, Plaintiff was able to fully extend the knees, thereby reproducing a forward flexion of 90 degrees." Defs.' Reply at 6. But none of these findings obviously refutes those of plaintiff's treating physicians. Dr. Halejian offers no basis for his judgment that plaintiff's numbness was non-anatomical; indeed, he notes that when tested by means of pinprick, plaintiff reported "decrease[d] sensation of the right lower leg at the level below the knee in a stocking like distribution." PRU229. Meanwhile, plaintiff's silence upon distraction and palpation may simply have been stoicism. And as for Dr. Halejian's account of plaintiff's having achieved a 90-degree forward flexion, plaintiff's own version of events is different, and raises questions about Dr. Halejian's findings. In a June 22, 1999 letter to Prudential, plaintiff wrote:

> Jennifer, from your office . . . informed me that Dr. Halejian said I was
> cooperative during his physical examination. I informed her that I thought him
> cruel, due to the fact that without warning he raised my right leg straight up in the
> air. I felt a stab of pain due to the suddenness of it.

PRU163.

Even if Dr. Halejian's findings were more compelling, the Court would ascribe less weight to his assessment than to those of plaintiff's treating physicians Drs. DiFranco and Golzad. Defendants correctly observe that the "treating physician rule," familiar from the context of Social Security appeals, does not apply here. See Defs.' Reply at 5 (citing, inter alia, Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003)). But the cases defendants cite do

---

[plaintiff] on an [independent medical examination] with a Dr. of Occupational Medicine.").

not *prohibit* ERISA plan administrators and reviewing courts from ascribing greater weight to the opinions of treating physicians than to the opinions of non-treating physicians, as defendants suggest. See id. ("Unequal treatment is unequal treatment, no matter how it is justified. Plaintiff is looking for exactly the type of special treatment of her physicians' reports that Courts have stated is not permitted."). Rather, they state that such an approach is not required. See Black & Decker, 538 U.S. at 825 ("We hold that plan administrators are not obliged to accord special deference to the opinions of treating physicians."). In fact, while declining to import the treating physician rule into the ERISA context, the Supreme Court has cautioned that "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Id. at 834.

The Supreme Court also has observed that deferring to the opinion of a treating physician "may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration, or when a specialist engaged by the plan has expertise the treating physician lacks." Id. at 832. But no such objection is warranted here. On plaintiff's account, Dr. DiFranco treated her for at least five years from March 1994 through February 1999, PRU196-98; Dr. Golzad, meanwhile, saw her at least four times over fifteen months between December 1997 and March 1999, PRU252, 208, 402, 182. Dr. Halejian, by contrast, examined plaintiff once, in January 1999, PRU228. Likewise, although the record does not indicate that Dr. DiFranco possesses special expertise relevant to plaintiff's condition, it may be presumed that Dr. Golzad, a neurologist, did possess such expertise, and that his opinion carries at least as much weight as that of Dr. Halejian, an occupational specialist. Thus the Court declines to adopt the judgment of Dr. Halejian, and instead relies on those of Drs. DiFranco, Eswar, Golzad, Seo,

and Slovis, and credits plaintiff's claim that she suffers from severe, persistent lower back pain.

## 2.   Plaintiff Is Unable to Perform the Duties of Her Own Occupation

In her initial application for benefits on February 9, 1998, plaintiff described her duties as

follows: "Sitting at my desk for approx. 6 hrs. a day, typing legal docs & letters, faxing

docs—down the hall, send out emails for the 3 attys." PRU397. In an April 13, 1999 letter to

Prudential, subsequent to the denial of her claim, plaintiff sought to clarify her description:

> As an assigned legal secretary at Winthrop, Stimson, Putnam & Roberts
> the definition is as follows:
> - Assignment to a workload of 3 to 4 attorneys at a time
> - Long, continuous sitting hours at a computer
> - General clerical duties including trips to the Duplicating
>   department, and Fax Room, as well as other departments, this
>   includes the use of internal stairs for speedy delivery.
> During my initial years at Winthrop, Stimson, Putnam & Roberts I was an
> assigned secretary with no real difficulties. This is because of the fact that I was
> equipped with a chair that provided some back support, due to my submission of
> an official doctor's note.
> My status as an assigned secretary was changed in the early part of 1993 to
> that of a floating secretary. This change came about as a result of budget cutbacks
> and the fact that I had all the necessary skills and many years of experience.
> You may not be aware that the definition of a floating secretary also
> includes being assigned to different work areas on a daily basis. These work areas
> were ill equipped for my disorder. Many of my floating assignments required
> organization of files and file documents. On occasion lifting boxes of documents
> and/or batches of files were required in order to deliver requested files to my
> assigned attorneys from the file room.

PRU180-81. Defendants do not significantly dispute this account of plaintiff's duties, with one

exception: they insist that plaintiff's job required no lifting. Compare Pl.'s Rule 56.1 Stat't ¶ 24

(plaintiff's assertion that she was "required to organize files by lifting and delivering boxes of

documents to and from a file room.") with Defs.' Resp. Pl.'s Rule 56.1 Stat't ¶ 24 (denying

13

same). The source of the dispute over lifting appears to be a May 14, 1999 telephone conversation between plaintiff and Jennifer Virtell, a Prudential claims analyst, in which plaintiff described a 1995 project that involved moving "many many boxes" of files into a closet. PRU040. Citing their own letter of July 27, 1999 to plaintiff, defendants now insist that Winthrop Stimson has "confirmed that there was only *one* project that required any lifting, that project was of limited duration and that this particular project was completed in 1995," Defs.' Mem. at 5 (citing PRU147). But the record indicates that in a telephone conversation on May 17, 1999, Virtell asked Connie Tabitas, a representative of Winthrop Stimson, whether plaintiff's job had "required her to occasionally lift boxes of documents and batches of files"; the response was that plaintiff "probably did have to do this on occasion," and that the boxes had weighed approximately twenty-five pounds.[7] PRU039. Indeed, the correspondence on which defendants rely reflects this response, rather than suggesting that the 1995 task was the only lifting that plaintiff ever had to do. In relevant part, the letter reads: "As part of our evaluation of your appeal, we contacted Winthrop, Stimson, Putnam & Roberts to clarify your job requirements. We were advised that you may have been required to occasionally lift or carry up to approximately 25 pounds." PRU146. The Court thus concludes that, as a "floating secretary" at Winthrop Stimson, plaintiff served up to four attorneys at a time; that she spent much of her day seated at a desk, but also stood and walked frequently (when making trips to the duplication department or fax machine); and that, on an occasional basis, plaintiff was required to lift

---

[7]The account of this telephone call contradicts that of an earlier call in which Virtell asked Winthrop Stimson employee Lisa Botwinick "if EE's job required any lifting" and Botwinick answered that it had not. PRU037. But defendants themselves rely upon the later call in which Connie Tabitas described "occasional" lifting of up to twenty-five pounds.

documents weighing up to twenty-five pounds.

Plaintiff claims that her back pain made it increasingly difficult—and, by December 1997, impossible—for her to perform these duties. In her April 13, 1999 letter to Prudential, she explains: "As a floater my back pain progressed until I could no longer work." PRU181. In a subsequent letter, she recounts "the embarrassment when getting up to do some work-related task and discover[ing] that I cannot walk," as well as "the feeling of taking so many painkillers I was falling out at the computer." PRU164. Defendants question plaintiff's claims, citing Dr. Halejian's conclusion that although plaintiff "should avoid heavy lifting and should be allowed to stretch and stand and sit ad lib throughout the course of her work day," she remained "capable of working as a secretary." Defs.' Mem. at 4 (citing PRU230). Defendants also argue that the medical evidence does not show that plaintiff's condition grew worse between 1994 and 1997. Because plaintiff could do her job in 1994, defendants contend, and her condition did not deteriorate subsequently, there was nothing to prevent her from continuing to work in 1997, and their denial of benefits at that time was proper:

> Prudential's position is that her back appears to be in the same condition in 1997 as it was in 1994 and that Plaintiff was able to work for three (3) years in that condition. Since there was no real difference and she had proven that she could work in that condition during that time, her claim for disability benefits was denied.

Id. This, defendants explain, is "the most significant aspect of [their] argument": "The only adjustment that could have taken place was that Plaintiff changed how she was dealing with her pain . . . . Thus, Plaintiff's disability was not about her physiological condition[,] only how she was able to work with the condition she had." Defs.' Reply at 3-4.

Upon de novo review, the Court finds that a preponderance of the evidence in the record

15

supports plaintiff's claim that her medical condition precluded her from performing the duties of her job at Winthrop Stimson. The Court relies on plaintiff's credible testimony that her back pain kept her from sitting or standing for long periods, and that the amitriptyline she was prescribed, while offering some relief, also produced debilitating side effects. The Court relies, as well, on the judgment of Dr. DiFranco, who in February 1998 opined that plaintiff was "not able to work under any circumstances." PRU304. The Court relies further on the judgments of the consulting physicians whose reports the ALJ considered, including Dr. Seo, who found that plaintiff was able to sit and stand only thirty minutes without interruption and to lift and carry approximately twenty pounds; and Dr. Slovis, who found that plaintiff was able to lift and carry only ten pounds occasionally and to sit, stand, or walk about six hours in an eight-hour workday. PRU156-57. The Court notes that the ALJ, too, concluded that plaintiff was unable to continue in her job.[8] PRU157. Finally, the Court observes that the record contains only one opinion supporting defendants' contention that plaintiff was capable of continuing in her job at Winthrop Stimson. This is the opinion of Dr. Halejian, cited above, which offers neither a specific assessment of plaintiff's residual functional capacity nor an express consideration of the requirements of her job, but instead baldly declares that "the patient is capable of working as a secretary, however, she should avoid heavy lifting and should be allowed to stretch and stand and

---

[8]Defendants argue that "the ALJ's determination is inherently flawed to be determinative [sic]," since, having concluded that plaintiff was capable only of sedentary work, the ALJ made "no attempt . . . to apply that conclusion to Plaintiff's actual occupation at the time of her disability or what she *could* be employed to do." Defs.' Reply at 7. The criticism misses the mark. As the ALJ explained, once he determined that plaintiff was limited to sedentary work, there was no need to measure her functional capacity against the requirements of her job, or against those of other jobs existing in the national economy, because SSA regulations directed that a claimant of plaintiff's age and background with a sedentary residual functional capacity be found disabled. PRU157.

16

sit ad lib throughout the course of her work day." PRU230. Defendants have offered no compelling reason why the Court should privilege this thinly justified minority view over the other functional capacity assessments described in the administrative record—all of which support the conclusion that plaintiff could not have fulfilled the requirements of her job at Winthrop Stimson (six hours seated, regular standing and walking, and occasional lifting of up to twenty-five pounds)—and the Court declines to do so.

Nor is the Court persuaded by defendants' contention that plaintiff's condition did not change between 1994 and 1997, and that since plaintiff worked during that period, there was no good reason for her to stop working when she did. The record simply does not demonstrate that plaintiff's condition remained static between 1994 and 1997. Defendants argue that "the MRIs and X-rays reveal that Plaintiff's physiological condition was not substantially worsened between 1994 and 1997 . . . . While plaintiff may have had discomfort, the fact remained that she had substantially the same exact bad back in 1997 that she had in 1994." Defs.' Reply at 6. Defendants point out that the 1994 MRI showed a disc bulge at L5-S1 and degenerative arthritis, and argue that the 1998 MRI "showed no changes and, therefore, no progression of this condition." Id. Indeed, the 1998 MRI showed "no significant interval change since a previous MRI examination dated 3/26/94." PRU211. It is not clear, however, that a finding of "no significant interval change" precludes an increase in plaintiff's symptoms. Moreover, no such consistency exists between the 1994 and 1997 X-rays of plaintiff's back. The 1994 X-ray of plaintiff's lumbosacral spine yielded the following findings: "Partial lumbarization S1 toward the right side. Otherwise negative." PRU268. By contrast, an X-ray performed in 1997 revealed degenerative changes in the lumbosacral spine, as well as anterior osteophyte formation, a

17

finding consistent with degenerative disc disease, at L1-L2, L2-L3, L3-L4, and L4-L5. PRU262.

See Mesimeris v. United States, No. 03-CV-0925, 2006 U.S. Dist. LEXIS 3466, at *24

(E.D.N.Y. Jan. 17, 2006) ("Osteophytes are the byproduct of degenerative disc disease, or

spondylosis."). These findings, combined with plaintiff's credible account of increasing pain,

defeat defendants' claim that plaintiff had "substantially the same exact bad back" in 1994 and

1997, and that her performance of her secretarial duties in 1994 proves that she remained able to

discharge those duties in 1997.


3.     **Plaintiff Is Unable to Perform the Duties of Any Occupation to Which She Is Reasonably Fitted by her Education, Training, and Experience**

Finally, the Court must address whether plaintiff's condition precludes her not only from

performing the duties of her own occupation, but also from doing any other job for which she is

reasonably fitted by her education, training, or experience.[9] The record contains only three

assessments of plaintiff's condition, other than plaintiff's own, that address this question directly.

On one side of the dispute are Dr. DiFranco's conclusion that plaintiff was "not able to work

under any circumstances," PRU304, and the ALJ's judgment that plaintiff was capable only of

sedentary work, and therefore met the requirements for a disability finding. PRU158. On the

other side is the report of Dr. Halejian, who opines that the available evidence, including his

examination of plaintiff, "does not support total disability." PRU230. Of the three assessments,

only the ALJ's reflects a balancing of plaintiff's functional capacity against the work for which

---

[9]As plaintiff points out, Pl.'s Reply Final Submission [hereinafter Pl.'s Reply] at 6-7, this question differs significantly from the one posed several times in defendants' submissions to this Court: whether plaintiff can perform *any* job. See Defs.' Mem. at 8; Defs.' Reply at 6.

she was qualified. As noted above, the ALJ performed no such balancing himself. Rather, having determined that plaintiff had the residual functional capacity to perform "the full range of sedentary work," and noting that she was fifty-two years old, a high school graduate, and without any acquired work skills transferable to the skilled or semiskilled activities of other jobs, he concluded: "Section 404.1569 of the Regulations No. 4 and Rule 201.14, Table No. 1, Appendix 2, Subpart P, Regulations No. 4 direct that the claimant, considering her residual functional capacity, age, education, and work experience, be found 'disabled.'" PRU158.

On plaintiff's account, the ALJ's decision "provide[s] sufficient evidence to demonstrate that [plaintiff] is unable to perform the material and substantial duties of any job for which she is reasonably fitted by her education, training, or experience." Pl.'s Mem. at 6. Somewhat ironically, defendants respond by urging the Court to rely on the ALJ's ruling, which they elsewhere so roundly criticize. They identify the rule relied upon by the ALJ as Section 201.00(g), Appendix 2, Subpart P, of Part 404 of the SSA regulations, which indicates that when an individual of plaintiff's age "can no longer perform vocationally relevant past work and [has] no transferable skills, a finding of disabled ordinarily obtains." Plaintiff, they argue, *is* capable of performing relevant past work, since "a 'sedentary residual functional capacity' sounds *exactly* like the position that Plaintiff described in her application for benefits and which she held even before she became a 'floater.'" Defs.' Reply at 7.

Contrary to plaintiff's contention, the ALJ's ruling does not command the conclusion that she is totally disabled within the meaning of the Plan, because the question at issue here differs from the one the ALJ confronted. The ALJ's task was to determine whether plaintiff "not only [was] unable to do [her] previous work but [could not], considering [her] age, education, and

19

work experience, engage in any other kind of substantial gainful work which exist[ed] in the national economy." 42 U.S.C. § 423(d)(2)(A). By contrast, this Court must determine whether plaintiff is able to do any work for which she is "reasonably fitted by [her] education, training or experience." PRU373. For the purposes of this calculation, certain considerations within the ALJ's purview—plaintiff's age and the existence in the national economy of suitable jobs, for example—are immaterial. In fact, as defendants point out, the ALJ's finding that plaintiff was capable of "the full range of sedentary work" actually supports, not the conclusion that plaintiff is totally disabled within the meaning of the Plan, but the conclusion that she is *not* disabled, since plaintiff's experience appears reasonably to have fitted her for certain forms of sedentary work, including less demanding secretarial jobs than the one she held at Winthrop Stimson.

The Court is not constrained to accept the ALJ's conclusion that plaintiff is capable of "the full range of sedentary work," however, and the Court declines to do so, for the reason that the ALJ's assessment appears to understate the gravity of plaintiff's condition. In determining that plaintiff possessed the capacity for sedentary work, the ALJ effectively adopted the residual functional capacity assessment offered by Dr. Slovis (i.e., that she could sit, stand, or walk for six hours in an eight-hour workday and lift up to ten pounds). The Court finds, however, that neither Dr. Slovis's opinion, nor that of Dr. Halejian that plaintiff was "capable of working as a secretary," each of which was based on a single examination of plaintiff, is sufficient to overcome the evidence in the record supporting a finding of total disability. The record contains objective medical evidence, including MRIs, X-rays, and the opinions of Drs. DiFranco, Eswar, and Golzad, that substantiates plaintiff's claim to suffer from severe, chronic lower back pain. Consulting physician Dr. Seo, according to the ALJ, judged plaintiff unable to sit or stand for

more than thirty minutes at a time. Dr. DiFranco, who treated plaintiff for at least five years, was

of the opinion that she was "unable to work under any circumstances." Plaintiff herself offers the

credible claim that her condition forces her to choose between debilitating lower back pain and

medication whose side effects render her unable to work. Based on this evidence, the Court

concludes that plaintiff cannot function effectively as an employee in any job for which she is

reasonably fitted. Thus it finds that she is totally disabled within the meaning of the Plan, and

entitled to long-term disability benefits.


### C.     Plaintiff's Entitlement to Other Relief

Without elaboration or argument, plaintiff asks the Court to order defendants to "make

immediate payment with interest of all benefits wrongfully withheld," as well as "other

compensatory damages, her fees and expenses, and such other and further relief [as] may be just,

equitable, and proper." Pl.'s Mem. at 7. Defendants contend that plaintiff is not entitled to pre-

judgment interest, because "the long-term disability plan at issue does not allow for the payment

of interest on past due benefits." Defs.' Mem. Supp. Mot. Summ. J. at 30. They answer further

that because Prudential carefully considered plaintiff's claim, and did not act in bad faith,

plaintiff is not entitled to attorney's fees. Id. Defendants do not answer plaintiff's claims for

compensatory damages and costs. For the reasons explained below, the Court finds that Plaintiff

is entitled to prejudgment interest; that she is not entitled to compensatory damages; and that she

is entitled to recover her costs and attorney's fees.

## 1.    Plaintiff Is Entitled to Pre-Judgment Interest

As noted above, defendants imply that the Court may not order a payment of pre-judgment interest in an action for benefits under ERISA where such a payment is not expressly contemplated in the benefits plan at issue. This is incorrect. See Dobson v. Hartford Fin. Servs. Group, Inc., 389 F.3d 386, 397-400 (2d Cir. 2004) (holding that a reviewing court could enforce an interest obligation *implied* in the terms of an ERISA plan). See also Katsaros v. Cody, 744 F.2d 270, 281 (2d Cir. 1984) ("[I]t is well-settled that ERISA grants the court wide discretion in fashioning equitable relief to protect the rights of pension fund beneficiaries including the award of prejudgment interest."); Scalamandre v. Oxford Health Plans (N.Y.) Inc., 823 F. Supp. 1050, 1063 (E.D.N.Y. 1993) ("An award of prejudgment interest is appropriate in ERISA cases.").[10]

Nevertheless, pre-judgment interest "must not result in over-compensation of the party to whom judgment has been awarded," and should be awarded "only in cases where such an award is 'fair, equitable and necessary to compensate the wronged party fully.'" Mendez v. Teachers Ins. & Annuity Ass'n & College Ret. Equities Fund, 982 F.2d 783, 790 (2d Cir. 1992) (quoting Wickham Contracting v. Local Union No. 3, IBEW, 955 F.2d 831, 835 (2d Cir. 1992)). In determining whether to award pre-judgment interest, the Court considers four factors: "(i) the

---

[10]The single case defendants cite on this point, Walsh v. Eastman Kodak Co., 53 F. Supp. 2d 569 (W.D.N.Y. 1999), is plainly distinguishable. The court in Walsh held that interest was not recoverable where benefits were "initially withheld or delayed *but subsequently paid prior to the initiation of a lawsuit* . . . ." Id. at 572 (emphasis added). Here, of course, plaintiff has filed a lawsuit to recover benefits the Court has found were owing to her under the Plan. See also id. at 573 ("The Court finds a clear distinction between an award of prejudgment interest and an independent judgment for interest on a delayed payment. A court can only award prejudgment interest upon finding that a defendant violated a provision of ERISA for which Congress authorized relief." (quoting DeVito v. Pension Plan of Local 819, 975 F. Supp. 258, 270-73 (S.D.N.Y. 1997)) (internal citation omitted)).

need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." Jones v. Unum Life Ins. Co. of Am., 223 F.3d 130, 139 (2d Cir. 2000) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1476 (2d Cir. 1996)).

Here, the balance of factors weighs in favor of an award to plaintiff of pre-judgment interest. There is no indication that such an award will result in over-compensation. The actual damages to plaintiff exceed the value of the benefits wrongfully denied by defendants, since the denial has deprived her of the investment value of those benefits over a period of several years. As discussed below, although defendants do not appear to have acted in bad faith, their denial of plaintiff's application for benefits violated a federal statute whose objectives include "to increase the likelihood that participants and beneficiaries under single-employer defined benefit pension plans will receive their full benefits." 29 U.S.C. § 1001b(c). Equity thus dictates that plaintiff be repaid with interest.

### 2.     Plaintiff Is Not Entitled to Compensatory Damages

The Second Circuit has explained that compensatory money damages are unavailable to plaintiffs proceeding under 29 U.S.C. § 1132(a)(3), as plaintiff is here, since that section authorizes only equitable relief. Coan v. Kaufman, 457 F.3d 250, 262-64 (2d Cir. 2006). Plaintiff also proceeds under 29 U.S.C. § 1132(a)(1)(B), but nothing in that section authorizes this Court to award money damages. Thus plaintiff's request for compensatory damages must be denied.

23

### 3.    Plaintiff Is Entitled to Recover Her Costs and Attorney's Fees

Awards of attorney's fees and costs are authorized by Section 502(g)(1) of ERISA, 29

U.S.C. § 1132(g)(1), which provides that "in any action under this title . . . by a participant,

beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and

costs of action to either party." Because "separate analyses govern costs and attorney's fees,"

Chapman v. ChoiceCare Long Island Long Term Disability Income Plan, No. 05-0687, 2005

U.S. App. LEXIS 29193, at *3 (2d Cir. Dec. 29, 2005), the Court considers these issues

separately.

ERISA does not prescribe "any unusual standard" for determining whether a prevailing

party is entitled to costs. Id. at *3 n.1. The Court's consideration of plaintiff's request for costs

therefore is governed by the Federal Rules of Civil Procedure, which provide that "[e]xcept when

express provision therefor is made either in a statute of the United States or in these rules, costs

other than attorney's fees shall be allowed *as of course* to the prevailing party unless the court

otherwise directs . . . ." Fed. R. Civ. P. 54(d)(1) (emphasis added). Defendant has offered no

reason why the Court should not award costs in this instance. Accordingly, the Court grants

plaintiff's application to recover her ordinary costs other than attorney's fees.

The Second Circuit has explained that "ERISA's attorney's fee provisions must be

liberally construed to protect the statutory purpose of vindicating retirement rights, even when

small amounts are involved." Chambless v. Masters, 815 F.2d 869, 872 (2d Cir. 1987). Indeed,

"attorney's fees may be awarded to the prevailing party under ERISA in the absence of some

particular justification for not doing so." Birmingham v. Sogen-Swiss Int'l Corp. Ret. Plan, 718

F.2d 515, 523 (2d Cir. 1983). In deciding whether to award attorney's fees, the Court considers

five factors:

> (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

Chambless, 815 F.2d at 871. "No one of the five factors is necessarily decisive, and some may not even be appropriate in a given case, but together they comprise the nuclei of concerns that a court should address in applying [§ 1132(g)]." Scalamandre, 823 F. Supp. at 1065 (internal quotation marks and citation omitted).

Here, the balance of factors weighs in favor of an award of fees. First, although the degree of defendants' culpability appears not to be great, they *are* culpable, since they deprived plaintiff of benefits to which she was entitled. The Court rejects defendants' claim that because they did not act in bad faith, the first Chambless factor is not satisfied. See Paese, 449 F.3d at 450 ("'[C]ulpability' and 'bad faith' are distinct standards."). Rather, "a defendant is 'culpable' under Chambless where it 'violated ERISA, thereby depriving plaintiffs of rights under a pension plan and violating a Congressional mandate.'" Id. (quoting Salovaara v. Eckert, 222 F.3d 19, 28 (2d Cir. 2000)). Second, defendants do not argue that they are unable to pay plaintiff's fees. Third, it may be that an award of fees in this case will help deter plan administrators assessing other claims from denying those claims in the face of similar evidence of disability. Fourth, the entire foregoing discussion serves as the basis for this Court's conclusion that the balance of the merits tips in plaintiff's favor. Finally, although plaintiff has offered no evidence that her action

has conferred a common benefit on a group of plan participants, the Second Circuit has explained that "failure to satisfy [the fifth] factor need not preclude an award of attorney's fees." Mendez, 982 F.2d at 789 (citing Ford v. New York Cent. Teamsters Pension Fund, 642 F.2d 664, 665 (2d Cir. 1981)). The Court reiterates, as well, that Congress intended, in enacting ERISA, to help ensure that plan participants receive "their full benefits." 29 U.S.C. § 1001b(c). Plaintiff should not bear the expense of securing the benefits to which she was rightfully entitled under the Plan. Accordingly, the Court grants her application to recover her attorney's fees.

## CONCLUSION

For the reasons explained above, the Court finds that plaintiff has demonstrated by a preponderance of the evidence that she is totally disabled within the meaning of the Plan, and that she is entitled to the payment of benefits. The Court further finds that plaintiff is entitled to pre-judgment interest, costs, and attorney's fees. Absent agreement of the parties, the Court refers the matter of calculation to United States Magistrate Judge Kiyo A. Matsumoto.

SO ORDERED.

Dated: Brooklyn, New York
       July 17, 2007

                                      s/ Judge Raymond J. Dearie
                                      _____
                                      RAYMOND J. DEARIE
                                      United States District Judge

26